In re MANCHESTER STEEL, INC., Debtor.

INDUSTRIAL PLANTS CORPORATION, Plaintiff,

v.

Marvin A. SICHERMAN, Trustee in Bankruptcy For Manchester Steel, Inc., Defendant.

Bankruptcy No. B92–11222.
Adv. No. B92–1542.

United States Bankruptcy Court, N.D. Ohio, E.D.

July 30, 1993.

Jonathan M. Yarger, Kohrman, Jackson & Kranz, Cleveland, for plaintiff.

Jerome Leiken, Dettelbach, Sicherman & Baumgart, Cleveland, OH, for defendant.

Marvin A. Sicherman, Cleveland, OH, U.S. Trustee.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

### I.

In this involuntary Chapter 7 case, Plaintiff, Industrial Plants Corporation (IPC) seeks to compel performance on a contract. An order for relief was entered on March 26, 1992. During the period between the filing of the involuntary petition and the Court's entry of an Order for Relief (the Gap Period), a quantity of steel product (110 tons of galvalume steel) was sold to a third party known as Dove Die and Stamp-

ing Company (Dove Die). Upon entry of the Order for Relief, Marvin A. Sicherman was appointed as the interim trustee (the Trustee) in the case for the purpose of liquidating the Debtor's estate. Subsequent to his appointment, the Trustee was authorized by the Court to continue the Debtor's business operations for a limited period in order to complete certain work-in-progress and to facilitate the collection of the Debtor's accounts receivable for the estate's benefit. (J.X.–1). During this period of limited operation, the Trustee negotiated a bulk sale of steel inventory to Herman Enterprises, Ltd. of Stamford, Connecticut (HEL). Plaintiff IPC is the assignee of HEL. The principal terms of the offer were embodied in a Term Sheet Sale of Inventory (Term Sheet) dated June 3, 1992. (J.X.–2). In pertinent part, the Term Sheet contained the following language:

> Quantity: 18,187,676 lbs. or more of steel inventory of Manchester Steel, Inc., wheresoever situated, except approximately 323,000 lbs. of .035 galvanized coils purchased by Manchester Steel, Inc. for Manchester Steel, L.P. for sale to the U.S. Navy located at California Finished Metals and/or Santa Fe Railroad Warehouse.

> Price: $1,740,000.00 (approximately $9.57 per cwt.) Net FOB—and if weight short pro rata for shortage.

> .   .   .   .   .

> Delivery: Removal by Purchaser from premises at 20900 St. Clair Avenue, Euclid, Ohio....

> .   .   .   .   .

> Misc.: Commencing day after Closing, Purchaser responsible for *all* post-closing "off-site" expenses incurred. Estate to pay for same prior to date of Closing, with respect to all of the off-site locations. (Emphasis added.)

> .   .   .   .   .

> Warranty: Trustee ... warrants that sale shall be free of all liens ... makes no warranties or representations whatsoever, except for express terms contained above, and sale is "as is and where is".

The Term Sheet was signed by Ronald S. Herman, HEL's principal, on June 3, 1992, as offeror. Notedly, the Term Sheet was not counter-signed by the Trustee or his agent. This Court approved the sale procedure to be utilized on June 4, 1992. An auction sale was conducted on June 30, 1992, wherein HEL was the highest bidder for the steel inventory. Following a hearing, the sale was confirmed by this Court on July 2, 1992. July 15, 1992 was the established Closing Date.

## II.

Among IPC's several Complaint allegations, it alleges that the steel inventory it purchased on June 30, 1992 should have included the 110 tons of galvalume steel which were sold during the gap period to Dove Die, as it was listed on a perpetual inventory sheet provided by the Trustee upon which it relied. IPC further contends that it learned the galvalume steel was not included in its acquired inventory until after the auction sale had occurred. In fact, it learned that such steel had been purchased by and transferred to Dove Die on April 2, 1992. Further, it learned that the Dove Die invoice was back-dated from a June 16, 1992 date to the date of April 2, 1992 to reflect the actual delivery date.

Additionally, IPC contends that it was required to retrieve some of the purchased steel inventory from certain off-site storage locations. In this regard, one such site was the Auburn Correctional Facility (ACF) which allegedly required IPC to pay an amount of $4,500.00 in storage charges before it would release a quantity of the Debtor's steel it had earlier rejected but had not returned. IPC alleges that the Debtor's estate is responsible for a portion of that storage charge pursuant to provisions of the Term Sheet. In summary, IPC seeks damages totalling $80,134.26 as compensation for the omitted galvalume steel, in addition to $2,700.00 as reimbursement for one-half the amount it paid to ACF for release of steel stored at ACF's location.

In response, the Trustee states that the galvalume steel sold to Dove Die was not estate property at the time of the inventory bulk sale to HEL and that, consequently, IPC has no right to that particular steel. Further, the Trustee alleges that neither the Term Sheet, nor the Notice of Sale, specified galvalume steel. Both simply address "steel inventory" in an amount of 18,187,676 lbs. or more. He further asserts that neither document referenced any inventory computer print-out.

## III.

■ The dispositive issues are two-fold: (1) Whether the Trustee fully performed on IPC's offer to acquire the Debtor's steel inventory; and (2) Whether IPC is entitled to be reimbursed for pre-closing off-site storage costs it paid to the ACF. As the complainant, the burden of proof rests upon IPC to prove its cause of action by a preponderance of evidence standard.

An examination of the Notice of Sale (Notice) (J.X. 3) pertaining to the Trustee's sale of the Debtor's steel inventory shows that such inventory was proposed to be sold to HEL for $1,740,000.00, subject to adjustment, for 18,187,676 pounds or more of non-specified steel. The Notice further provided that the Term Sheets, which were attached to the Notice, addressed "the general terms and conditions of the proposed sales." Additionally, the Notice indicated clearly that "Any party submitting a written bid, must do so on one or more applicable Term Sheet(s), and must sign the same....."

As indicated above, the Term Sheet signed and tendered on behalf of HEL reflects the same quantity of non-specified steel inventory and at the same purchase price addressed in the Notice of Sale. There was no reference to any type of specified steel in the Term Sheet (J.X. 2), other than "323,000 lbs. of .035 galvanized coils" excepted from the bulk sale which belonged to the U.S. Navy. Neither the Notice of Sale nor the Term Sheet signed on behalf of HEL made any reference to galvalume steel. Even the purchase price provisions of the Notice of Sale and the Term Sheet did not address a specific type of steel being purchased by HEL. These documents only provided for price adjustments in the event of "weight" shortages, not on account of any specific type of steel shortages. Finally, this Court's Order Confirming Sale, issued on July 2, 1992 (J.X. 4) provided the following, in pertinent part:

> All of the Inventory as described *in the Notice of Sale and applicable Term Sheet,* for the sum of $1,770,000.00 to Industrial Plants Corporation of 211 East 43rd Street, New York, N.Y. as the designee of Herman Enterprises, Ltd., without relieving Herman Enterprises, Ltd. of its obligation to consummate the purchase. (Emphasis added).

From the above language in the Order Confirming Sale, it is further evinced that the terms set forth in the Notice of Sale and the applicable Term Sheet embodied precisely what was being offered for sale by the Trustee.

As stated above, IPC contends that the Term Sheet did not fully manifest the parties intentions, as HEL relied also on a computerized print-out containing a perpetual inventory of the Debtor's inventory (P.X. 9) which was provided to HEL by one Irwin Haber, the Trustee's agent who negotiated the sale on behalf of the Trustee. In support of that contention, IPC asserts that, without a merger or integration clause in the Term Sheet, there was no final expression of the parties' intent and consideration of the print-out would not be precluded under an application of the parole evidence rule.

## IV.

Applicable non-bankruptcy law on express warranties provides:

(A) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(B) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

O.R.C. § 1302.26

■ It is not necessary that the seller make the description to create an express warranty. The seller need only be responsible for introducing the description into the bargaining process. *Slyman v. Pickwick Farms,* 15 Ohio App.3d 25, 15 OBR 47, 472 N.E.2d 380 (1984).

■ Whether or not the statement made forms a part of the basis of the bargain between the parties requires the court to consider the circumstances surrounding the sale, the reasonableness of the buyer in believing the seller, and the reliance placed on the seller's statement by the buyer. *Price Bros. Co. v. Philadelphia Gear Corp.,* 649 F.2d 416, 422 (6th Cir.1981); *Slyman v. Pickwick Farms,* 15 Ohio App.3d 25, 28, 15 OBR 47, 50, 472 N.E.2d 380 (1984).

> The U.C.C. does not require that express warranties be made a part of the written agreement of the parties, and express warranties may be added by proof of oral warranties so long as the writing is not itself a complete integration of the agreement.

*Price Bros. Co. v. Philadelphia Gear Corp., supra,* at 422.

Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

O.R.C. § 1302.29(A).

## V.

■ This adversary proceeding adjudicates a dispute arising out of a court ordered sale of estate assets and as such is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (N). Accordingly, this Court has original jurisdiction to hear this matter and enter a final order resolving the dispute. 28 U.S.C. § 1334(b); General Order No. 84.

The Court has reviewed the testimony adduced during the trial proceeding, in addition to the evidence admitted and the record, generally. Therein Marvin A. Sicherman (the Trustee) testified that he hired Irwin Haber to assist in liquidating the Debtor's remaining inventory. This was accomplished by filling open purchase orders and by selling steel piecemeal for cash. (Haber, Direct.) The Trustee also sought to sell the remaining inventory, wherever situated, in bulk, with the exception of that steel specifically held for a U.S. Navy contract. As the Debtor's former chief financial officer, Haber was familiar with the Debtor's computerized inventory system and its contents. Specifically, he testified that the Debtor owned galvanized, hot rolled, and special coated steels, but no aluminum.

The Trustee negotiated the sale of the Debtor's steel inventory to HEL through Haber. (Herman, Direct; Sicherman, Direct.) Herman negotiated the sale on behalf of HEL. Herman has been in the business of purchasing/brokering steel for 30 years and has personally engaged in thousands of steel transactions both domestically and internationally. (Herman, Direct and Cross.).

The Trustee directed Haber to distribute computer generated printouts of the Debt-

or's perpetual inventory to prospective purchasers to use as a framework in soliciting bids. (Sicherman, Direct.) Herman received computer printout INV11R, dated April 29, 1992, and computer printout DMO60R, dated April 27, 1992, on or about April 30 or 31, 1992. (Herman, Direct.) Computer printout INV11R represented steel located at the Debtor's main facility at 20900 St. Clair Avenue, Cleveland, Ohio. (*Id.*) Computer printout DMO60R represented steel located at off-site locations. (*Id.*).

There was conflicting testimony as to what representations were made regarding the computer printouts. Herman testified that Haber represented the computer printouts were accurate listings of the steel inventory of the Debtor. Haber testified he told Herman that historically the computer printouts were accurate, but with the recent "chaos," they could not be relied upon.

■ The computer printouts may be considered in construing the parties' agreement. Sicherman testified that all of Herman's verbal and written offers were rejected with the exception of that offer contained in the Term Sheet dated June 3, 1992. (Sicherman, Direct.) Herman believed that the Term Sheet was a bankruptcy form required by the Court, summarizing the purchase agreement he believed he had previously reached with the Trustee via a letter of May 15, 1992. (Herman, Direct.) The significance of this contention is IPC's attempt to incorporate the computer printouts into the purchase agreement for the Debtor's inventory as IPC contends the computer printouts created a warranty with respect to that sale. The Term Sheet did not reference the computer printouts; the May 15, 1992 letter did.

In order for the Court to preclude reference to the computer printouts, the Court must find the parties intended the Term Sheet to be a complete and exclusive statement of their agreement. O.R.C. § 1302.-05(B); *Camargo Cadillac Co. v. Garfield Ent., Inc.,* 3 Ohio App.3d 435, 3 OBR 514, 445 N.E.2d 1141 (1982). The evidence does not support the Trustee's contention that the parties intended the Term Sheet to be a complete and exclusive statement of their agreement. First, the Term Sheet does not contain a merger or integration clause. Secondly, the Term Sheet is incomplete and ambiguous. Even Haber testified that one could not determine what steel was being sold by reference to the Term Sheet alone. Finally, Herman testified that the Term Sheet was a summary of an oral agreement which terms were detailed in a letter of May 15, 1992. (PX3). *See, Camargo Cadillac Co., supra* (a determination of whether a writing is a complete and exclusive statement of the terms of the agreement between the parties is made by considering all the evidence presented by the parties about their intentions). Accordingly, parol evidence may be considered to explain or supplement the Term Sheet. O.R.C. § 1302.05. The computer printouts serve just that purpose.

■ The computer printouts do not constitute a warranty. IPC contends that the computer printouts constituted a description of goods which was made part of the basis of the bargain therefore creating an express warranty that all goods shall conform to the description. *See, Slyman v. Pickwick Farms, supra;* and *Price Bros. Co. v. Philadelphia Gear Corp., supra.* Indeed, the Trustee admits introducing the description into the bargaining process. Moreover, the warranty disclaimers made at the auction and in the Term Sheet do not serve to effectively disclaim any alleged express warranty as to the type, condition or quantity of steel being sold as that general disclaimer is inconsistent with the alleged express warranties asserted by IPC. *Barksdale v. Van's Auto Sales, Inc.,* 62 Ohio App.3d 724, 577 N.E.2d 426 (1989). After considering the facts and circumstances surrounding the transaction, however, it is clear that Herman did not reasonably rely upon the computer printouts as representing an express warranty as to the type, condition and quantity of steel he was purchasing. Thus, no warranty was created.

Computer printout INV11R listed 110 tons of galvalume steel as part of the Debt-

or's steel inventory. (Haber, Cross; Herman, Direct; PX9.) This type of steel, valued on a price per pound basis, was the most valuable steel in the inventory. (Herman, Direct.) This steel was listed in computer printout INV11R erroneously as it had been sold to Dove Die in either March or April of 1992 and had been shipped out of the Debtor's facility. (Haber, Direct and Cross; Young, Cross.) Haber first learned that the galvalume steel was no longer in the Debtor's steel inventory in mid-June, 1992.[1] The parties, however, gave conflicting testimony as to when Haber notified Herman that the galvalume steel was no longer part of the Debtor's steel inventory. Herman maintains that said notice was after confirmation of the sale, thus he had no opportunity to object to the sale on that basis. Haber maintains that he notified Herman prior to the sale, on or about June 18, 1992 and further contends that Herman then asked for a credit. Notwithstanding this testimony, it was uncontradicted that Herman was notified prior to the sale that the Debtor could not locate the galvalume steel in the main facility. Thus, HEL was notified that computer printout INV11R was inaccurate and could not be relied upon notwithstanding any alleged representations previously made by Haber to the contrary as INV11R was allegedly a listing of all steel in the main facility.

Herman knew that the computer printouts were standard steel perpetual inventories.[2] (Herman, Cross.) Perpetual inventories are a written record to which incoming steel is recorded and outgoing steel is deleted. (Haber, Cross.) Herman understood that physical inventories are taken to correct inaccuracies in perpetual inventories. (Herman, Cross.) The only way to confirm that the steel listed in the perpetual inventory was missing was to take an actual physical inventory. (Haber, Cross.) With this knowledge of industry practice and, while in possession of the inventory data, Herman made no request for a physical inventory.

Although Herman visited the Debtor's warehouse on three occasions and physically inspected the warehouse and its contents, Herman never inspected the warehouse for the express purpose of confirming the existence, quantity or condition of the galvalume steel. (Herman, Cross.) Rather, he inspected the steel inventory with an eye toward checking the general condition of the steel, ie., whether it was rusted, banded, etc. (Herman, Direct.) This testimony was incredible, in view of Herman's earlier testimony that the galvalume steel was the most valuable of the Debtor's inventory. If it was so valuable, Herman's walk-through physical inspection should have revealed the absence of any galvalume steel. Herman testified that a walk-through inspection was his general practice prior to acquiring an inventory of steel. This testimony further revealed that Herman did not rely upon the computer printouts at all as they pertained to the condition of the steel. The computer printouts contained descriptions of the condition of the steel, yet Herman found it necessary to confirm the condition of the steel by physical inspection.

The foregoing evidence reflects that any reliance that Herman may have had on the computer printouts was unreasonable. Therefore, the computer printouts were not

---

**1.** Haber discovered that an invoice generated by the Debtor on June 16, 1992 was backdated to April 2, 1992 to address the Dove Die shipment. That occurrence was not surprising to him as it was the proper thing to do for the purpose of correlating the invoice date with the delivery date. He further testified that the Debtor's invoices are normally dated as of the bill of lading date. It is significant to note that other invoices were generated on June 16, 1992 and pertained to sales other than to Dove Die. Exhibit PX5 reflects that the Debtor's estate received $82,-000.00 for the Dove Die sale, and the dated Dove Die invoice was not an attempt to defraud or mislead anyone. Haber's testimony was credible.

**2.** "Perpetual inventory" has been defined as an "inventory accounting system whereby book inventory is kept in continuous agreement with stock on hand; also called 'continuous inventory'. A daily record is maintained of both the dollar amount and the physical quantity of inventory, and this is reconciled to actual physical counts at short intervals. Perpetual inventory contrasts with 'periodic inventory'." *Dictionary of Finance and Investment Terms,* 2d Ed.1987.

a part of the basis of the bargain between the Trustee and HEL. *Price Bros. Co. v. Philadelphia Gear Corp., supra; Slyman v. Pickwick Farms, supra.* Thus, no warranty was created and no breach of warranty occurred. O.R.C. § 1302.26.

The Complaint also alleges breach of contract for failure to deliver all of the steel as required in the parties' agreement. The Term Sheet states that HEL agreed to buy, and the Trustee agreed to deliver, a minimum of 18,187,676 pounds of the Debtor's steel inventory, wheresoever situated, except for that steel carved out for a military contract. The computer printouts were not a basis of the bargain and do not set forth binding contractual terms as to the quantity, type or condition of the steel. HEL did purchase and the Trustee did deliver the minimum quantity of steel. In fact, the Trustee delivered approximately 200,000 pounds of steel in excess of the minimum quantity. There is no evidence that the Trustee failed to deliver the agreed quantity of steel.

IPC presented evidence that it paid $4,500.00 for storage costs with respect to steel it purchased from the Debtor and which was located at ACF. The Trustee failed to present any evidence in rebuttal. Rather, he relied on his argument that the $4,500.00 did not really constitute storage charges but was a method by which ACF, a creditor, sought to obtain payment on its prepetition claim. The Trustee failed to present any evidence substantiating his argument.

The Term Sheet obligates the Trustee to pay off-site storage costs incurred prior to the close of the sale. IPC presented unrebutted evidence that the Trustee's share of these costs is $2,700.00. Such charges constitute an administrative expense under 11 U.S.C. § 503(b)(1)(A).

Accordingly, judgment on the Complaint is entered in favor of the Trustee on IPC's cause of action for breach of contract (Count I) and breach of express warranty (Count II). Judgment is entered in favor of IPC in the amount of $2,700.00 on its cause of action for reimbursement of an administrative expense (Count III) and breach of contract (Count IV). Each party is to bear its respective costs.

IT IS SO ORDERED.