[Cite as *Metal Seal v. Good Time Outdoors, Inc.*, 2018-Ohio-5326.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| METAL SEAL PRECISION, LTD., AN OHIO LIMITED LIABILITY COMPANY, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellant, | : | **CASE NO. 2017-L-142** |
| | : | |
| - vs - | : | |
| | : | |
| GOOD TIME OUTDOORS, INC., d.b.a. CORE15 RIFLE SYSTEMS, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 2015 CV 000123.

Judgment: Affirmed.

*Grant J. Keating* and *JoAnna Tatarko*, Dworken & Bernstein Co., L.P.A., 60 South Park Place, Painesville, OH 44077 (For Plaintiff-Appellant).

*Richard J. Marco, Jr.*, Marco & Marco, 52 Public Square, Medina, OH 44256 (For Defendants-Appellees).

TIMOTHY P. CANNON, J.

{¶1} Appellant, Metal Seal Precision, Limited ("Metal Seal"), appeals the October 3, 2017 judgment of the Lake County Court of Common Pleas. Following a bench trial, the trial court found in favor of appellees, Norman Clifton III and Good Time Outdoors, Inc., d.b.a. Core15 Rifle Systems ("Good Time Outdoors"). The trial court's judgment is affirmed for the following reasons.

**Procedural History**

{¶2}   This case stems from Metal Seal's business relationship with Good Time Outdoors. Metal Seal is a machine shop located in Mentor, Ohio. A portion of its business includes manufacturing machine parts for the firearms industry. Good Time Outdoors, Inc. is located in Ocala, Florida and conducts business under three divisions: Good Time Outdoors Airboats, Bluegrass Armory, and Core15 Rifle Systems. Core15 Rifle Systems assembles AR-15 rifles for sale to retailers and individuals.

{¶3}   In early 2012, Metal Seal began supplying Good Time Outdoors with bolt carrier groups ("BCGs"), a critical component of AR-15 rifles. The parties engaged in business together until 2014.

{¶4}   On January 23, 2015, Metal Seal filed in the Lake County Court of Common Pleas a complaint against Good Time Outdoors and its president, Norman P. Clifton, III. The complaint alleged that the parties entered into a General Terms and Conditions of Sale agreement ("General Terms"), pursuant to which Metal Seal agreed to manufacture certain goods, and Good Time Outdoors agreed to purchase those goods. The complaint alleged Good Time Outdoors breached the General Terms, and Metal Seal was entitled to relief. In addition to breach of the General Terms, the complaint also raised claims for unjust enrichment, promissory estoppel, and action on account. With leave of court, Metal Seal filed an amended complaint.[1]

{¶5}   Good Time Outdoors and Clifton filed an answer and counterclaim on March 20, 2015. The counterclaim was later withdrawn.

---

1. In the amended complaint, the date the General Terms were entered into by the parties was changed from "January of 2013" to "June, 2012," and the section of the General Terms regarding damages for breach was changed from "Section 16(c)" to "Section 15(c)."

**{¶6}** Metal Seal filed a motion for summary judgment on December 18, 2015. Good Time Outdoors filed a brief in opposition, and Metal Seal filed a reply. The trial court denied the motion for summary judgment.

**{¶7}** The matter proceeded to a bench trial on January 31 through February 3, 2017. The following facts are summarized from the testimony and evidence presented at trial.

## Purchase Orders 11028 & 11139

**{¶8}** Metal Seal and Good Time Outdoors began conducting business together after meeting at a firearms convention in January 2012. In February 2012, David Blackburn, Metal Seal's salesman, exchanged several e-mails with Thomas Cistola, the purchasing and sales manager for Good Time Outdoors. They discussed pricing, quantity, and lead time for the manufacture of both manganese phosphate ("MagPhos") and nickel boron ("NiBr") BCGs. Per Cistola's request, Blackburn sent an e-mail on February 13, 2012, quoting $108.00 per unit for 100 NiBr BCGs per month for 12 months, with a lead time of 12 to 14 weeks to the first delivery. The next day, Cistola sent Purchase Order 11028 for the purchase of 100 NiBr BCGs per month, totaling $10,800.00 per month. The purchase order indicated the initial shipment would be sent May 15 to June 1, 2012, and ordered the same quantity be shipped once per month, through December 2012, on the 15th of each month.

**{¶9}** On February 20, 2012, Blackburn and John Habe, the president of Metal Seal, met with Clifton and Cistola to persuade Good Time Outdoors to provide Metal Seal with a "request for quote" for MagPhos BCGs. During the meeting, they discussed quantities and pricing. On February 25, 2012, Blackburn sent Cistola an e-mail, quoting

3

$73.00 per unit for MagPhos BCGs for a total of 2,300 units. The quote proposed components would be shipped June through December 2012 in the following quantities per month: 200 units in June and July 2012; 300 units in August and September 2012; 400 units in October and November 2012; and 500 units in December 2012. The lead time to the first delivery would be 12 to 14 weeks. Cistola replied to the quote, indicating he wanted to "bump up the quantities from Aug on out." Cistola e-mailed Purchase Order 11139 on March 13, 2012, for a total of 35,000 units of MagPhos BCGs at a unit price of $69.00 in the following quantities per month: 2,000 units in May and June 2012; 2,500 units in July through September 2012; 3,000 units in October and November 2012; and 3,500 units in December 2012 through February 2013. Cistola's e-mail stated: "If we can get the first 500 shipped the second week of May and are on track with the PO by June 1 that would be fantastic." The next day, Cistola sent Blackburn an e-mail, stating: "Per our discussion earlier, here are the revisions." The revised purchase order added shipments for 3,500 units in March and April 2013. It also indicated "net 15 terms." Habe testified that meant Good Time Outdoors would pay Metal Seal "in 15 days after we shipped the parts."

{¶10} Habe testified this was the "[l]argest firearms order Metal Seal had ever received." To manufacture the higher volume of parts, Metal Seal had to increase its capacity and purchased $2,168,735.00 in additional equipment and machinery. Metal Seal also spent additional sums on tooling, training, and set-up. Habe testified the cost to increase capacity was incorporated in Metal Seal's price quotes.

**General Terms and Conditions of Sale**

{¶11} On May 31, 2012, Blackburn sent an e-mail to Cistola offering to extend the payment terms to "net 30" if Clifton would sign a "personal guarantee of payment." On

4

June 7, 2012, a little more than three months after the first purchase order between the parties, Blackburn sent Cistola an e-mail with the General Terms document attached. The last section of the document was titled "Personal Guaranty." On June 8, 2012, Cistola e-mailed the document back to Blackburn with Clifton's signature assenting to the terms and conditions and the personal guaranty.

{¶12} Good Time Outdoors could not get parts fast enough to meet customer demand, and throughout the summer of 2012, Metal Seal's BCG shipments fell well below the ordered quantities. Metal Seal shipped the following quantities of parts from May through September 2012 under Purchase Order 11028: 0 of 100 units in May; 200 of 100 units in June; 0 of 100 units in July; 0 of 100 units in August; and 100 of 100 units in September. The following shipments were made May through September 2012 under Purchase Order 11139: 428 of 2,000 units in May; 975 of 2,000 units in June; 650 of 2,500 units in July; 2,000 of 2,500 units in August; 1,250 of 2,500 units in September.

**Purchase Order 11139 Revised**

{¶13} At the request of Metal Seal, in September 2012, Good Time Outdoors revised Purchase Order 11139 to reflect an increased price per unit for MagPhos BCGs. The increased unit price accounted for the additional capacity required to meet Good Time Outdoors' need for greater quantities of parts.

{¶14} On September 27, 2012, Cistola sent Blackburn revised Purchase Order 11139, reflecting 3,200 units of MagPhos BCGs at $70.36 per unit "[e]ffective 10/1/12 through 12/1/13." The purchase order further stated: "Core 15 retains the right to reduce quantities w/ 30 days notice. Any additional will be added to the end of the PO. Min qty per month of 2,000 pcs."

5

**{¶15}** In October 2012, Metal Seal shipped 800 of 3,200 units that were ordered under Purchase Order 11139. No shipments were made under Purchase Order 11028 that month.

**{¶16}** On November 8, 2012, Blackburn sent an e-mail to the bookkeeper for Good Time Outdoors, stating no payment had been made on a past due amount of $62,550.00. The e-mail indicated Good Time Outdoors was placed on a credit hold, and Metal Seal would suspend shipments of product until the account was current. Habe testified the parties communicated about payment on a "regular basis," and Good Time Outdoors requested continued shipments and made promises that the payments would be made.

**{¶17}** On November 19, 2012, Clifton sent an e-mail to Blackburn, requesting an immediate shipment of 400 BCGs. Clifton sent another e-mail on November 27, 2012, requesting "ETAs on shipments over the next 30 days." Clifton further explained: "We will be out of BCG by the end of today. We are overnight a check for $33,421.00 on Invoice # 12091. If you can send us an Invoice for the 800 that we received on 11/16, I will get a check to you this week also. I will commit to paying Metal Seal on a 15 day bases going forward, But I need Product. [sic.]" The same day, Blackburn responded, stating 400 BCGs were being shipped that day and that Metal Seal planned on shipping 800 units per week going forward. Blackburn explained a two-day power outage at the plant caused a disruption in production. He further stated: "We want to keep Core 15 as a long term customer and are committed to do our best to get product to you when you need it. Our guys have been advised that you were running low on BCG inventory and to make Core 15 shipments a priority."

**{¶18}** Metal Seal's shipments continued to fall below the ordered quantities. In November 2012, Metal Seal shipped 100 of 100 units under Purchase Order 11028 and 1,200 of 3,200 units under Purchase Order 11139. Metal Seal shipped 0 of 100 units under Purchase Order 11028 in December 2012.

**New Arrangement with Slabe Machine Parts, Co.**

**{¶19}** Habe testified that in December 2012, Cistola visited the Metal Seal facility to discuss delivery and quality control problems. One of the issues Metal Seal experienced was producing the "bolt carrier" for the MagPhos BCGs. Cistola learned that Slabe Machine Parts, Co. ("Slabe") manufactured bolt carriers. A new arrangement was made, pursuant to which Good Time Outdoors would purchase the bolt carrier component for the MagPhos BCGs directly from Slabe. It would continue to purchase the rest of the MagPhos BCG components and the complete NiBr BCGs from Metal Seal. Good Time Outdoors would assemble the MagPhos BCGs at its facility and absorb any extra costs for doing so.

**{¶20}** Good Time Outdoors issued new purchase orders to reflect the new arrangement. These purchase orders superseded Purchase Order 11139.

**{¶21}** On December 7, 2012, Cistola sent Purchase Order 12212, and on December 14, 2012, he sent Purchase Order 12253. The purchase orders reflected the different MagPhos BCG components Good Time Outdoors was ordering from Metal Seal and indicated different quantities and prices depending on the component. Metal Seal shipped the parts for those orders on the dates they were issued.

**{¶22}** On December 20, 2012, Purchase Orders 12270 through 12281 were issued for January through December 2013.

7

**Purchase and Supply Agreement**

{¶23}  On January 28, 2013, Blackburn sent Cistola a "Purchase and Supply Agreement" ("Purchase Agreement") for review and signature.  The Purchase Agreement included an "Exhibit A."  Good Time Outdoors refused to sign the Purchase Agreement.

{¶24}  In June 2013, Good Time Outdoors issued Purchase Orders 13135 through 13146 for MagPhos BCG components to be shipped January through December 2014.  It also issued Purchase Order 13167 for complete NiBr BCGs at a price of $108.00 per unit to be shipped June 2013 through May 2014 in the following quantities: 200 units per month in June and July 2013, and 500 units per month for August 2013 through May 2014.  Under Purchase Order 13167, Good Time Outdoors also ordered uncoated MagPhos BCG components to be sent monthly from May 2013 through May 2014.

{¶25}  Habe testified that in spite of the new purchase orders, Cistola indicated he would take as many parts Metal Seal could produce, and Purchase Order 11139 was left open for Metal Seal to send Good Time Outdoors the rest of its completed MagPhos inventory.  Metal Seal shipped complete MagPhos BCGs under purchase order 11139 in the following quantities: 900 units in December 2012; 450 units in January 2013; 541 units in February 2013; and 900 units in March 2013.  The complete MagPhos BCGs were shipped in addition to the components under the new arrangement.

**Purchase Orders Suspended**

{¶26}  Metal Seal made shipments pursuant to Purchase Orders 12270 through 12278 from January through September 2013.  Of these purchase orders, the only month in which Metal Seal's shipments met the quantity of parts ordered was Purchase Order

8

12276 in July 2013. During the same time frame, under Purchase Order 13167, Metal Seal sent 200 of 200 units in June 2013 and 200 of 200 units in July 2013.

{¶27} By mid-2013, Good Time Outdoors no longer needed a large quantity of parts. Douglas Gifford, Good Time Outdoors' Director of Operations, testified Good Time Outdoors was having cash flow issues. Good Time Outdoors became overdue to Metal Seal on several invoices. On August 27, 2013, Habe, Blackburn, Clifton, and Gifford met in Clifton's office in Florida to discuss past due balances and quantities. On August 30, 2013, Habe sent an e-mail to Gifford proposing a reduced shipping schedule and price adjustments for MagPhos BCG components and complete NiBr BCGs. After follow-up e-mails from Habe requesting a phone call, Gifford sent an e-mail response on September 5, 2013, indicating someone would be in touch with him. On September 6, 2013, Blackburn sent an e-mail to Good Time Outdoors' bookkeeper to follow up on Good Time Outdoors' past-due balance. The bookkeeper indicated Good Time Outdoors hoped to get a payment to Metal Seal in the next week. On September 9, 2013, Habe e-mailed Gifford and explained that Metal Seal was still producing MagPhos BCG components and complete NiBr BCGs and would be sending out shipments that day. Habe stated that Good Time Outdoors had an overdue balance of $317,686.00 and that Metal Seal's bank was involved.

{¶28} On September 12, 2013, Habe sent Clifton an e-mail with the General Terms attached. The parties talked by telephone the next day. Metal Seal indicated Good Time Outdoors had failed to pay on numerous invoices. Clifton sought to suspend the remaining purchase orders because Good Time Outdoors could not keep accepting product it could not use.

**{¶29}** On September 23, 2013, Gifford sent Habe an e-mail, stating:

> Per the teleconference of Tuesday, September 17th between Yourself, Mr. Blackburn, Mr. Clifton and myself, I am reconfirming that Core Rifle Systems has suspended all P.O.'s with Metal Seal Precision until further notice.
>
> Please feel free to contact me with any questions or concerns.
>
> We look forward to meeting with you on the 27th.

**{¶30}** Habe responded the same day. Habe stated that Metal Seal "purchased raw material, tooling, machines, etc. to build parts for your orders and have millions of dollars of inventory built or in the process of being built to fill your orders." The e-mail further stated that Metal Seal could not accept Good Time Outdoors' position in suspending the purchase orders, and Metal Seal was looking to "negotiate a solution."

**{¶31}** On September 27, 2013, Habe sent Gifford an e-mail outlining a proposed solution that had been discussed by the parties. The e-mail proposed a new shipping and price schedule. The unit price for MagPhos components and complete NiBr BCGs was to increase with decreased monthly shipment quantities. It also indicated that Good Time Outdoors could request shorter lead times. The e-mail proposal further stated that Good Time Outdoors "will not purchase these parts from any other supplier unless [Metal Seal] cannot meet [Good Time Outdoors'] delivery dates and quantities. In this scenario Good Time Outdoors can purchase the quantity needed to subsidize the shortfall."

**{¶32}** Gifford responded by e-mail on October 1, 2013, with Purchase Orders 13905 through 13909 for October 2013 through February 2014, reflecting the proposed arrangement. Gifford indicated the new purchase orders would supersede the previous purchase orders for that time period. These purchase orders did not reflect that Good

10

Time Outdoors would not purchase the parts from other suppliers unless Metal Seal failed to meet delivery dates and quantities.

**{¶33}** On October 8, 2013, Blackburn sent Gifford an e-mail with Metal Seal's own proposed purchase orders reflecting the proposed agreement. Blackburn indicated Gifford could use those purchase orders "as reference." Metal Seal's purchase orders included greater detail regarding the terms outlined in the September 27, 2013 e-mail and contained language that Good Time Outdoors would not purchase the parts from other suppliers unless Metal Seal failed to meet the delivery dates and quantities. Ultimately, no agreement was reached by the parties with regard to these new proposals.

**{¶34}** Habe testified that Metal Seal ceased shipments as of the September 23, 2013 e-mail from Good Time Outdoors. Metal Seal's last shipment went out on September 18, 2013. Habe affirmed that at the time the purchase orders were suspended Metal Seal was "sitting on finished product that had not yet been delivered." Habe explained: "We had a lot of product. We had nickel boron carrier groups and we had a bunch of components for the mag phos components that they asked us to deliver. We had those built. And we also had the ones that were not plated. We had some of those bolts as well." Habe further testified that Metal Seal had 4,295 NiBr BCGs that were completed but never shipped to Good Time Outdoors. This amounted to over $400,000.00 in completed NiBr BCGs. Metal Seal was able to sell approximately 4,000 of those parts to a different customer at $105.00 per unit, $3.00 less per unit than what Good Time Outdoors had agreed to pay. Metal Seal also had to put "about five bucks into each part" because the new customer wanted the parts customized. Habe testified that Metal Seal lost a total of $8.00 per part and sustained a total loss of $32,000.00 for

the parts sold. Habe further testified that Metal Seal had 295 NiBr BCGs remaining. Each part cost $102.00 to produce, totaling $30,090.00 to produce the 295 units. Habe explained the total cost for goods that were finished but never shipped to Good Time Outdoors was $62,090.00.

{¶35} Habe further testified that at the time the orders were suspended, Metal Seal had numerous purchase orders that were unfulfilled. Habe testified to 15 months of outstanding purchase orders for MagPhos BCG components: 12279 through 12281 and 13135 through 13146, each totaling $184,835.00. In addition to those purchase orders, Habe testified to a total unfulfilled order of 5,000 units for NiBr BCGs. Metal Seal had built 4,295 units, discussed above, leaving a balance of 705 units at $108.00 per unit for a total of $76,140.00. Habe further testified Good Time Outdoors also ordered $68,000.00 in uncoated parts. The total of unfulfilled orders was $2,916,665.00. Habe, however, testified that Metal Seal was not requesting that full amount in damages. Pursuant to the liquidation clause in the General Terms, Metal Seal was requesting 45% of the total unfulfilled orders, or $1,312,499.25.

**Firing Pins & Components Returned to Metal Seal**

{¶36} By early 2014, Good Time Outdoors had made payments that reduced the amount it owed to Metal Seal for parts delivered to $84,606.00. However, in June 2014, Good Time Outdoors returned 1,545 chrome plated firing pins to Metal Seal claiming for the first time that they had defective coatings. The problem had not been noticed until Good Time Outdoors used up its inventory. Metal Seal took receipt of the returned firing pins and had them recoated. Blackburn retained the firing pins at the direction of Habe due to Good Time Outdoors' outstanding balance with Metal Seal. Good Time Outdoors

12

repeatedly requested the return of the firing pins so it could complete orders for rifles and pay off the remaining arrears. Metal Seal did not return the firing pins, and Good Time Outdoors returned the remainder of the BCG components in its inventory back to Metal Seal.

{¶37} Habe and Clifton met at the Las Vegas Shot Show in January 2015 and attempted to resolve the issues between the parties. They were unable to come to an agreement to settle their dispute.

{¶38} After a bench trial, the trial court entered judgment on October 3, 2017. The trial court concluded that the General Terms document signed in June 2012 was not an enforceable contract because it did not contain adequate terms. The trial court further concluded that the parties' conduct was not evidence of a contract because, "[w]hile the parties clearly wanted to maintain their business relationship and were flexible, there was no meeting of the minds on the essential terms of a contract." The court found in favor of Good Time Outdoors on Metal Seal's breach of contract claim. The trial court further ruled in favor of Good Time Outdoors on Metal Seal's claims for unjust enrichment, promissory estoppel, and action on account.

{¶39} Metal Seal noticed a timely appeal and raises five assignments of error, which we review out of order.

**Extrinsic Evidence**

{¶40} Metal Seal's second assignment of error states:

{¶41} "The Trial Court erred as a matter of law when it considered inadmissible evidence."

13

**{¶42}** Metal Seal argues the General Terms agreement is unambiguous, and it was therefore improper for the trial court to consider extrinsic evidence to interpret the General Terms agreement.

**{¶43}** "The standard of review in a breach of contract action is whether the trial court erred as a matter of law." *Falcone Bros.*, *Inc. v. Pawmew, Inc.*, 5th Dist. Stark No. 2016CA00209, 2017-Ohio-6958, ¶15, citing *Unifund, CCR, L.L.C. v. Johnson*, 8th Dist. Cuyahoga No. 100600, 2014-Ohio-4376, ¶7. "We must therefore 'determine whether the trial court's order is based on an erroneous standard or a misconstruction of the law.'" *Id.*, quoting *Unifund*, *supra*, at ¶7. However, due deference must be given to the trial court's findings of fact if the findings are supported by competent, credible evidence. *Id.*(citation omitted).

**{¶44}** There is no dispute that the transaction at issue involves the sale of goods. Accordingly, Ohio's version of the Uniform Commercial Code ("UCC"), found in Revised Code Chapters 1301 and 1302, is applicable to this case. *See Tubelite Co., Inc. v. Original Sign Studio, Inc.*, 176 Ohio App.3d 241, 2008-Ohio-1905, ¶12 (10th Dist.).

**{¶45}** "In construing the terms of any contract, the principal objective is to determine the intention of the parties." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999) (citation omitted). "We presume the intent of the parties to a contract resides in the language used in the written instrument." *Oryann, Ltd. v. SL & MB, LLC*, 11th Dist. Lake No. 2014-L-119, 2015-Ohio-5461, ¶25, citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.

**{¶46}** Generally, at common law, only where the language of a writing "is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language

14

with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions." *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St.3d 635, (1992), at syllabus. Ohio's UCC, however, rejects the common law rule that extrinsic evidence is admissible only where the terms of a writing are ambiguous. *See* R.C. 1302.05 Official Comment 1(c). R.C. 1302.05 provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (A) by course of performance, course of dealing, or usage of trade as provided in section 1301.303 of the Revised Code; and
>
> (B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

{¶47} Where the parties have reached a written agreement that is final with respect to the terms contained in the writing, evidence of prior agreements or contemporaneous oral agreements cannot be used to *contradict* those terms, but extrinsic evidence of trade usage, course of dealing, or course of performance may be used to *explain or supplement* the writing. *Camargo Cadillac Co. v. Garfield Ents., Inc.*, 3 Ohio App.3d 435, 438 (1st Dist.1982) (citations omitted). Further, if the writing is not "a complete and exclusive statement of the agreement," the writing may also be explained or supplemented by *consistent* additional terms. *Id.* To determine whether the parties intended the writing to be the complete and exclusive statement of their agreement, the court must look outside the four corners of the document and consider the surrounding facts and circumstances. *Id.* at 437-438; *Abele v. Bayliner Marine Corp.*, 11 F.Supp.2d

15

955, 963 (N.D.Ohio 1997); *In re Manchester Steel, Inc.*, 156 B.R. 988, 993 (N.D.Ohio 1993); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308, 1315 (S.D.Fla. 1999), citing *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 794, 796-797 (9th Cir.1981) and *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir.1983).

The General Terms agreement provides, in relevant part:

These General Terms and Conditions of Sale (this "Agreement") govern the manufacturing and sale of Products by Metal Seal Precision, Ltd., an Ohio limited liability company (the "Seller") to Core15Rifle Systems, Inc. (the "Purchaser"). Seller and Purchaser may herein be individually referred to as a "Party" or collectively as "Parties."

1. CONTRACT SCOPE AND DOCUMENTS

Absent a * * * contrary written agreement signed by both Parties, the contract between Seller and Purchaser shall be governed by Seller's written Quotation to Purchaser ("Quote"), Purchaser's written acceptance of the Quote ("Purchase Order"), and the terms stated in this Agreement (collectively the "Contract"). Absent Seller's prior written agreement, any term or provision stated in Purchaser's Purchase Order that is inconsistent with either the Quote and/or the within Agreement shall be ineffective and no part of the Contract. The Contract may not be modified except by a written agreement signed by both Parties. For purposes of the Contract, any notices or modifications that must be in writing may be satisfied by an exchange of e mail communications.

2. DESCRIPTION OF PRODUCTS/AGREEMENT TO SELL AND PURCHASE

The materials/parts/services covered under this Agreement ("the Products") are defined in Seller's Quote, which is incorporated by reference. * * * Seller agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Seller, the quantity of Products, at the prices and at the delivery dates stated in Seller's Quote. * * *

* * *

## 9. ENTIRE AGREEMENT

The terms of the Contract represent the entire understanding of the Parties regarding the subject matter hereof, and supersedes all prior understandings whether written or oral. Further amendments or modifications may only be made in writing, and must be signed by an authorized representative of each Party. No waiver of the breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition.

{¶48} The trial court determined that although Good Time Outdoors denied a contract existed, "Clifton's signature on the [General Terms] agreement is valid." The trial court, however, concluded the General Terms agreement was not enforceable because it lacked "sufficient essential terms." In coming to this conclusion, the trial court compared the General Terms agreement to the later Purchase Agreement. The trial court noted the two documents were similar, but that the Purchase Agreement contained "substantive changes clearly establishing a requirements contract." The trial court stated the fact that no price quotation was included with the General Terms document was "unlike the later 'Purchase and Supply Agreement' that was proposed by Metal Seal in December 2012 and rejected by Good Time Outdoors in the first half of 2013. The latter agreement provided exhibit A that did provide [the essential terms] information." The trial court explained:

> Exhibit A of the document specified delivery of components for 39,000 BCGs in 2013 with deliveries of 750 BCG components per week. The cost of the parts would be $51.31 per BCG. These components did not include the bolt carrier which was being manufactured by Slabe but included all of the other necessary parts for complete Mag Phos BCG. This exhibit also specified an annual quantity of complete (i.e. including the bolt carrier) Ni Br BCGs of 1,300 for 2013 for a unit cost of $109.00. 25 complete Ni Br BCGs were to be shipped weekly from April 15, 2013 through April 14, 2014. As mentioned earlier, the earlier General Terms and Conditions of Sale agreement did not have a similar exhibit.

17

{¶49} Although the trial court determined the General Terms agreement was not an enforceable contract and concluded "the actual terms of their relationship was not formally documented in writing," it found the parties' conduct indicated they had an "arrangement." The trial court analyzed the parties' conduct to determine whether the "arrangement" established a contract. The trial court concluded that, "[w]hile the parties clearly wanted to maintain their business relationship and were flexible, there was no meeting of the minds on the essential terms of a contract."

{¶50} Whether the signed General Terms agreement expressed terms that were enforceable in the business relationship should be determined without regard to a comparison with the subsequent Purchase Agreement that was never signed. Because the Purchase Agreement was never signed by Good Time Outdoors, it cannot provide consistent additional terms and is not evidence of the parties' intent at the time the General Terms agreement was signed. The Purchase Agreement cannot be used to supplement or explain the General Terms agreement because it is not a usage of trade, course of dealing, or course of performance.

{¶51} Further, because the General Terms agreement was a writing that documented at least *a portion* of the parties' agreement, the trial court did not need to determine whether the parties' conduct created a contract independent of the writing. Their conduct, however, is relevant to explain or supplement the writing to the extent the conduct is a trade usage, a course of performance, or a course of dealing.

{¶52} We determine that the surrounding circumstances indicate the parties did not intend the General Terms agreement to be the complete and exclusive statement of their agreement. Although the General Terms agreement contains an integration clause,

18

the agreement is unclear because the surrounding circumstances indicate the "Seller's Quote" and "Purchase Order" as defined in the General Terms agreement do not exist. The General Terms agreement states that the "Contract" is comprised of the General Terms agreement, "Seller's Quote", and "Purchase Order." The "Seller's Quote" operates as an offer, and the "Purchase Order" is the written acceptance of the "Seller's Quote" and must contain the same terms as the "Seller's Quote." The General Terms agreement purports that the price, quantity, and delivery terms are included in the "Seller's Quote." However, the only price quotations exchanged between Metal Seal and Good Time Outdoors were those sent in e-mails from Blackburn to Cistola on February 13, 2012, and February 25, 2012. Those quotes, however, were not assented to by Good Time Outdoors as contemplated by the General Terms. Rather, without prior approval from Metal Seal, Good Time Outdoors sent purchase orders with different terms than those contained in the price quotes. The General Terms is therefore final as to some but not all the terms of the parties' agreement, and under R.C. 1302.05, the General Terms may be supplemented or explained by a course of dealing, usage of trade, course of performance, or by consistent additional terms.

{¶53} Although it was error for the trial court to compare the General Terms agreement with the later Purchase Agreement and to analyze the parties' conduct as a separate contract, this was harmless error. The trial court's findings pertaining to the parties' conduct are relevant to explain or supplement the writing.

{¶54} Metal Seal's second assignment of error is without merit.

**Breach of Contract**

{¶55} We address Metal Seal's first and fifth assignments of error together. They state:

19

[1.] The Trial Court Erred as a matter of law when it held no contract existed between the parties.

[5.] The trial court's conclusion that Metal Seal never formally placed Good Time Outdoors in default was against the weight of the evidence.

{¶56} Metal Seal argues it is entitled to judgment as a matter of law on its claim for breach of contract. Metal Seal contends that Good Time Outdoors had "no right to unilaterally walk away from its obligations" and that "suspension and refusal to accept delivery of Metal Seal's goods in September 2013" constituted a failure by Good Time Outdoors to perform its obligations under the General Terms agreement and purchase orders. Metal Seal further maintains that "[n]either the language in the General Terms nor the Suspended Purchase Orders permit Appellees to unilaterally suspend their orders unless Metal Seal was in Default."

{¶57} Metal Seal maintains the following purchase orders were unfulfilled due to the suspension: 12279 through 12281 for MagPhos BCG components to be delivered from October 2013 through December 2013; 13135 through 13146 for MagPhos BCG components to be delivered from January 2014 through November 2014; and 13167 for complete NiBr BCGs and uncoated parts to be delivered from August 2013 through May 2014. Metal Seal further maintains that under purchase order 12278, it only made a partial shipment in September 2013 and would have completely fulfilled that order if the purchase orders had not been suspended.

{¶58} A cause of action for a breach of contract requires the claimant to establish: (1) the existence of a contract, (2) the other party's failure without legal excuse to perform when performance is due, and (3) damages or loss resulting from the other party's breach.

*Lucarell v. Nationwide Mutual Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶41 (citations omitted).

**{¶59}** "'A contract is generally defined as a promise, or a set of promises, actionable upon breach.'" *Kostelnik v. Helper*, 96 Ohio St.3d1, 2002-Ohio-2985, ¶16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). "A contract for the sale of goods imposes on the seller the obligation to transfer and deliver the goods in accordance with the contract and imposes on the buyer the obligation to accept and pay in accordance with the contract." *GJP Ents., Inc. v. Performance Contracting, Inc.*, N.D.Ohio No. 1:05CV0670, 2006 WL 2381492, *16 (Aug. 16, 2006), citing R.C. 1302.14.

**{¶60}** Under R.C. 1301.201(B)(3), "'[a]greement, as distinguished from 'contract', means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade[.]" "'Contract', as distinguished from 'agreement', means the total legal obligation that results from the parties' agreement[.]" R.C. 1301.201(B)(12).

**{¶61}** The General Terms agreement was clearly intended to govern the relationship between Metal Seal and Good Time Outdoors and states that: "Seller agrees to manufacture and sell to Purchaser, and Purchaser agrees to purchase from Seller, the quantity of Products, at the prices and at the delivery dates stated in Seller's Quote." As discussed above, there was no "Seller's Quote" as defined in the General Terms agreement. Instead, Good Time Outdoors sent Metal Seal purchase orders that contained price, quantity, delivery, and payment terms.

{¶62} However, the parties' course of performance further indicates they did not intend to manufacture and purchase exactly in accordance with the terms of the purchase orders. R.C. 1301.303(A) defines "course of performance" as

> a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

{¶63} In considering the parties' conduct, the trial court found:

> The evidence shows that over time, the parties changed the unit prices of the components, the terms of payment, the amount of product ordered and the delivery date. The POs had minimal language that ordered certain products at a set price. The expectation was that if product is delivered, the buyer must pay for it. * * * Although [PO11139] considerably exceeded the capacity of Metal Seal to deliver, there was no formal or written correspondence addressing this problem. The purchase order was not rejected by Metal Seal nor did Good Time Outdoors declare a default when Metal Seal failed to timely deliver the desired quantities. Blackburn testified that everyone knew there would be no compliance with the PO. Cistola told him to just get him as much product as you can. Subsequent purchase orders followed the same pattern and in many cases replaced previous orders. * * * Rather than one cohesive, implied contract, the parties engaged in a series of separate POs, many of which replaced earlier ones. The terms were loosely defined and were based on the needs and circumstances of the parties at the time.

The parties modified the terms of the purchase orders on an almost monthly basis. Each party regularly failed to comply with the terms of the purchase orders due to their circumstances and market conditions. On multiple occasions, Metal Seal sent no product, and it regularly sent quantities below those stated in the purchase orders; Good Time Outdoors was continually behind on payment. This course of performance evidences the parties' intent to be bound only from month-to-month, rather than to the multiple months

22

and set quantity of parts covered by the purchase orders. Good Time Outdoors' suspension of the purchase orders at issue was consistent with the parties' conduct throughout their relationship. Further, after Good Time Outdoors suspended the purchase orders, the parties made attempts to resolve their issues but were unable to come to an agreement. We cannot conclude that suspension of the purchase orders was a breach of the General Terms agreement. Accordingly, the trial court did not err by finding in favor of Good Time Outdoors on Metal Seal's breach of contract claim.

{¶64} Metal Seal argues the trial court's findings regarding the parties' conduct and "flexible" relationship is evidence of a course of dealing. R.C. 1301.303(B) defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Here, the parties' transaction involves multiple purchase orders that encompass several months with performance due each month. Their conduct did not pertain to previous transactions. Further, the trial court made findings regarding each party's acquiescence to the other's nonconforming performance. Accordingly, the trial court's findings regarding the parties' "flexible" relationship are evidence of a "course of performance" and are relevant to explain or supplement the General Terms agreement and to "show a waiver or modification of any term inconsistent with the course of performance." R.C. 1301.303(F). Metal Seal's argument is not well taken.

{¶65} The trial court did not err in determining Metal Seal was not entitled to judgment on its claim for breach of contract.

{¶66} Metal Seal's first and fifth assignments of error are without merit.

23

## Promissory Estoppel

{¶67} Metal Seal's fourth assignment of error states:

{¶68} "The trial court erred as a matter of law by concluding in the absence of an agreement, Metal Seal could not prove its claim for promissory estoppel."

{¶69} Metal Seal claims that in response to Good Times Outdoors' purchase orders, it purchased more than $2.1 million worth of equipment and hired and trained additional personnel.

{¶70} The elements required to establish a claim of promissory estoppel are "(1) a clear and unambiguous promise; (2) reliance on the promise; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise was injured by his or her reliance." *Connolly v Malkamaki*, 11th Dist. Lake No. 2001-L-124, 2002-Ohio-6933, ¶16 (citation omitted). As noted by the trial court, this claim was not specifically addressed by either party during trial or in the closing briefs. However, the trial court included findings of fact with regard to this claim in its October 3, 2017 judgment entry.

{¶71} The trial court found that the initial General Terms never committed Good Times Outdoors to a contract that required it to purchase a set quantity of parts for a set price. However, when asked to sign the Purchase Agreement, which did contain such terms, Good Time Outdoors refused to sign. In addition, as stated above, the record supports the fact that contrary to a fixed requirement contract for a period of time, the parties modified the purchase orders almost on a monthly basis. Metal Seal did not deliver the quantities ordered on the dates required, and Good Times Outdoors did not pay invoices when due. Thus, there is support in the record for the trial court's finding that there was "no evidence the parties had a meeting of the minds on the requirement

24

that Good Time Outdoors commit itself to purchasing a set quantity of parts regardless of market demand for assault rifles. Good Time Outdoors presented testimony it would never have agreed to such terms[.]  Absent an agreement from Good Time Outdoors, the court cannot conclude that Metal Seal's reliance was reasonable and foreseeable."

{¶72}  The trial court did not err in determining the elements of promissory estoppel had not been established.

{¶73}  Metal Seal's fourth assignment of error is without merit.

**Action On Account**

{¶74}  Metal Seal's third assignment of error states:

{¶75}  "The Trial Court's refusal to award Metal Seal damages on its claim on an account was against the manifest weight of the evidence."

{¶76}  In its judgment entry, the trial court noted that Metal Seal's claim for action on account was not specifically addressed by either party at trial or in their closing briefs. The trial court found the "Aged Receivables Report" attached to Metal Seal's amended complaint showed Good Time Outdoors owed Metal Seal $84,606.33 and was adequate to show an "account."  The trial court found that the evidence at trial "showed that Good Time Outdoors caught up with its arrears with Metal Seal" except for the $84,606.33. However, the trial court determined that Good Time Outdoors returned the equivalent amount of parts in June and November 2014.  The trial court concluded the "return of the firing pins and other BCG components extinguished the remaining arrears owed by Good Time Outdoors."

{¶77}  On appeal, Metal Seal argues it was improper for the trial court to determine the return of the parts to Metal Seal released Good Time Outdoors from its obligation to

25

pay the past due account balance. Metal Seal maintains it never agreed to accept the return of parts in lieu of payment, and Good Time Outdoors had no right to return previously accepted conforming parts. In response, Good Time Outdoors does not dispute that it did have an outstanding unpaid balance of $84.606.33 on its account with Metal Seal or that it had accepted the parts at issue. Instead, Good Time Outdoors argues the trial court appropriately found that it had satisfied its obligation of payment when it returned the firing pins and other parts to Metal Seal.

{¶78} R.C. 1302.66(A) provides, in pertinent part:

> The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it:
>
> (1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
>
> (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

{¶79} The trial court found that the remaining components could not be used by Good Time Outdoors after Metal Seal failed to return the allegedly defective firing pins, because "the firing pins are matched to the other components of BCGs and that even a slight variation in firing pin dimensions (presumably from firing pins from another vendor) could result in a malfunctioning BCG." Thus, Metal Seal's failure to return the firing pins substantially impaired the value of the rest of the parts. However, Good Time Outdoors failed to establish that the firing pins it returned were defective and that its acceptance was properly revoked. The trial court stated it was "unable to resolve if the firing pins were defective." Accordingly, we determine that Good Time Outdoors' burden to

26

establish proper revocation of its acceptance of the firing pins and other components was not met.

{¶80} However, in order to establish entitlement to recovery on the account, the seller cannot simply rely on the amount invoiced. R.C. 1302.77, titled "Seller's remedies in general," provides, in pertinent part: "Where the buyer wrongfully rejects or revokes acceptance of goods * * *, then with respect to any goods directly affected * * *, the aggrieved seller may: (D) resell and recover damages as provided in section 1302.80 of the Revised Code[.]" R.C. 1302.80(A) provides:

> Under the conditions stated in section 1302.77 of the Revised Code on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under section 1302.84 of the Revised Code, but less expenses in consequences of the buyer's breach.

{¶81} The trial court determined "[t]he design of the AR 15 assault rifle has been in the public domain for years and presumably the Mag Phos BCG at issue can be resold to another party. Metal Seal, in fact, was able to resell 4,000 Ni Br BCGs to a third party in June 2016[.]" Metal Seal had the burden to establish that it attempted to resell the MagPhos BCG parts at issue in good faith and in a commercially reasonable manner. However, there is nothing in the record or in its argument that establishes what damages Metal Seal should be entitled to after the attempts to sell the parts in mitigation. As the trial court noted, this claim on account was not specifically addressed by the parties at trial or in their final argument.

{¶82} The trial court did not err in refusing to award Metal Seal damages on its claim on an account.

27

{¶83} Metal Seal's third assignment of error is without merit.

{¶84} The judgment of the Lake County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J.,

CYNTHIA WESTCOTT RICE, J.,

concur.