[Cite as *Premier Const. Co., Inc. v. Maple Glen Apts. & Townhomes, Ltd.*, 2020-Ohio-4779.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| PREMIER CONSTRUCTION CO., INC., | : | CASE NO. CA2020-03-011 |
| Appellant, | : | O P I N I O N<br>10/5/2020 |
| | : | |
| - vs - | : | |
| | : | |
| MAPLE GLEN APARTMENTS AND<br>TOWNHOUSES LTD., et al., | : | |
| | : | |
| Appellees. | | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018 CVE 00481

Law Office of John H. Forg, John H. Forg, III, 11156 Main Street, Suite D, Sharonville, Ohio 45241, for appellant

Patrick L. Gregory, 717 West Plane Street, P.O. Box 378, Bethel, Ohio 45106, for appellees

**M. POWELL, P.J.**

{¶ 1} Premier Construction Co., Inc. appeals the decision of the Clermont County Court of Common Pleas, dismissing its claims against Maple Glen Apartments and Townhouses, Ltd. For the reasons that follow, this court reverses the trial court's decision and remands for further proceedings.

{¶ 2} In 2018, Premier filed suit against Maple Glen and its owner and manager, Indira Murthy, asserting breach of contract and mechanic's lien foreclosure claims.[1] The matter proceeded to a bench trial, where the evidence revealed that Premier was engaged in the business of supplying materials for residential construction. Maple Glen is a business engaged in owning and managing apartments.

{¶ 3} In January 2017, Murthy came to Premier's offices and met with Premier's owner, Jan Gilkey. Murthy presented Gilkey with blueprints for the construction of an 18-unit apartment building on Maple Glen's property. Murthy apparently wanted Premier to provide the materials and labor to construct the building. However, Gilkey informed Murthy that Premier did not have sufficient workers to construct a building of that size. Instead, Premier agreed to supply building materials for the project, including lumber for framing, and trim materials. Premier further agreed to assist Murthy in finding carpenters for the project.

{¶ 4} Based on Murthy's blueprints, and with some modifications suggested by Premier, Premier provided Murthy with an initial estimate. Murthy determined that the price was too high and did not proceed. Later, Premier provided Murthy with a second estimate. This written estimate was presented to Murthy on a Premier form titled "Estimate" which appears similar to a standard price quotation form. The form contains four columns, "Description," "Qty," "Price/Each" and "Total."

{¶ 5} The "Description" column listed the building materials that Premier proposed to deliver, including framing materials, exterior trim, and interior trim. The "Qty" column was left blank. The "Price/Each" column listed the unit prices for the materials that Premier

---

1. Premier filed suit against "*Glen Maple* Apartments and Townhouses, Ltd" but referred to the defendant in the body of the complaint as "*Maple Glen* Apartments and Townhouses, Ltd." Throughout these proceedings the parties and court have variously referred to the defendant as either "Glen Maple" or "Maple Glen." Maple Glen points out that its legal name is *Maple Glen* Apartments and Townhouses, Ltd.

proposed to deliver. For example, the framing materials were listed at a price of $107,300. Finally, the "Total" column contained identical figures as the "Total/Each" column. The grand total for the project was listed at the bottom of the form and was $165,666.08. Murthy signed the estimate on behalf of Maple Glen on September 6, 2017. Gilkey also signed the estimate.

{¶ 6} Gilkey testified that after the estimate was signed, the only issue left to resolve was when to make delivery to the job site. Gilkey said he and Murthy agreed that Premier would deliver the building materials in stages corresponding to the construction of the building's floors. Thus, Premier and Maple Glen agreed that the first delivery would contain the materials necessary to construct the first floor.

{¶ 7} Premier delivered the materials for the first floor to Maple Glen's job site in early October. On October 16, 2017, Premier issued Maple Glen an invoice for $24,331.20, which constituted payment for the first floor materials. The invoice indicated it was due upon receipt and that 1.5% interest would accrue per month after 30 days.

{¶ 8} Thereafter, due to a problem with the installation of foundation steel column supports, Murthy decided to postpone construction until the spring of 2018.[2] Murthy asked Premier to retrieve the delivered materials, store them for her over the winter, guarantee their pricing, and redeliver the materials in March 2018.

{¶ 9} Gilkey told Murthy that what she was proposing would be expensive and asked for payment for the delivered materials. However, Maple Glen did not pay. Gilkey testified that when it became apparent that Maple Glen did not intend to pay for the materials, he rented heavy equipment and transferred the materials from the job site to Premier's location.

---

2. The evidence indicated that without steel columns in place, carpenters could have worked for a few days before they would need to stop work and wait for the steel column installation.

{¶ 10} Premier issued a second invoice to Maple Glen that listed charges for the costs to retrieve the materials from the job site. This included charges for the rental of a forklift, two truck trips, and labor. This invoice totaled $3,447.00.

{¶ 11} Maple Glen did not pay this invoice. In January 2018, Premier issued two updated invoices, adding accrued interest. Also, in January 2018, Premier recorded an affidavit for mechanic's lien on Maple Glen's real property in the amount of $29,516.70. This amount represented the entire unpaid balance on both updated invoices.

{¶ 12} Gilkey testified that he sought to sell the retrieved building materials. Over the course of the next year, he was able to recoup approximately $18,000 by selling the materials. Thus, he was seeking approximately $7,000 from Maple Glen in contractual damages.

{¶ 13} After hearing the evidence, the trial court issued a decision dismissing Premier's contract claim. The court analyzed the issue as a "sale of goods" under the Uniform Commercial Code (UCC) and found that the parties had not validly contracted because the written estimate did not list the quantity of goods and therefore violated the statute of frauds as set forth in R.C. 1302.04. The court further noted that it found the estimate vague as to the goods to be supplied, and lacking a place of delivery, time of delivery, and terms of payment.

{¶ 14} The court also dismissed Premier's claim to foreclose its mechanic's lien. The court found that the lien was invalid because it was premised on an invalid contract. The court further found that the lien was invalid because the materials furnished by Premier were not used to improve Maple Glen's property and had been removed from the job site. Premier appeals, raising two assignments of error.

{¶ 15} Assignment of Error No. 1:

{¶ 16} THE TRIAL COURT ERRED IN RULING THAT PREMIER CONSTRUCTION AND MAPLE GLEN APARTMENTS DID NOT ENTER INTO A CONTRACT FOR THE DELIVERY OF MATERIALS FOR THE CONSTRUCTION OF A MULTI-UNIT APARTMENT BUILDING AND THAT MAPLE GLEN APARTMENTS BREACHED THAT CONTRACT BY REFUSING TO PAY FOR THOSE MATERIALS.

{¶ 17} Premier argues that the trial court erred in finding that it did not have a valid contract with Maple Glen because the parties had not agreed to a quantity term. Premier argues that because the "Total/Each" and "Total" columns were identical, the estimate necessarily called for a single quantity of each good and there was no ambiguity.

{¶ 18} Appellate review of a decision on the existence of a contract involves a mixed question of law and fact. *McSweeney v. Jackson*, 117 Ohio App.3d 623, 632 (4th Dist.1996). The appellate court will accept the factual findings of the trial court if supported by some competent, credible evidence. *Id*. Purely legal issues are reviewed de novo. *Ohio Dist. Council, Inc. of the Assemblies of God v. Speelman*, 12th Dist. Butler Nos. CA2018-02-025, CA2018-02-031, 2018-Ohio-4388, ¶ 18.

{¶ 19} The trial court found the underlying agreement to be a transaction for the sale of goods, which the parties do not dispute in this appeal. Accordingly, Ohio's version of the UCC, found in Revised Code Chapter 1302, applies.

{¶ 20} Premier's written estimate is similar to what courts have characterized as a price quotation. Price quotations may constitute offers to contract and may be deemed an offer to form a binding contract "if it is sufficiently detailed, and if it appears from the terms of the quotation that all that is needed to ripen the offer into a contract is the recipient's assent." *SST Bearing Corp. v. MTD Consumers Group, Inc.*, 1st Dist. Hamilton No. C–040267, 2004-Ohio-6435, ¶ 15, citing *Dyno Construction Co. v. McWane*, 198 F.3d 567, 572 (6th Cir.1999). The determination of whether a price quotation is an offer "is to be

made based 'upon the intention of the person communicating the quotation as demonstrated by all of the surrounding facts and circumstances.'" *H & M Landscaping Co., Inc. v. Abraxus Salt, L.L.C.*, 8th Dist. Cuyahoga No. 94268, 2010-Ohio-4138, ¶ 9, citing *Dyno Construction* at *id.*

{¶ 21} Here, there appears to be an intention by both parties that Premier's estimate was intended to be an offer to contract. Murthy initially approached Premier with blueprints and requested assistance in constructing the building. Premier indicated it could supply materials but not labor and the testimony at trial indicated that it took Premier some time to prepare the estimate. This process involved Premier recommending some changes to the blueprints. Murthy rejected an earlier estimate, because she believed that the price was too high.

{¶ 22} Murthy signed and dated the written estimate. Murthy testified that she signed on behalf of Maple Glen. Gilkey also signed the estimate. Premier then had the materials delivered, which delivery Maple Glen accepted at its job site.

{¶ 23} At trial, Murthy indicated that Maple Glen intended to move forward with the project as planned until she decided to delay the construction until the spring. Murthy asked Premier to remove the materials from the job site, not because she had rejected them, but because Maple Glen did not have facilities to store and secure the materials over the winter months. Murthy anticipated that Premier would store the materials over the winter and then redeliver them to the job site for construction to move forward the following spring. Thus, the circumstances in this case indicate that at the time Murthy signed the estimate, Premier intended for the estimate to be an offer and Maple Glen intended to be bound to the agreement. The next consideration is whether the written estimate was sufficiently detailed to be enforceable under the UCC.

{¶ 24} "Unlike the common law, the Ohio Uniform Commercial Code does not require that all essential terms of a contract be definite in order for the contract to be enforceable." *Tubelite Co., Inc. v. Original Sign Studio, Inc.*, 10th Dist. Franklin No. 07AP–601, 2008-Ohio-1905, ¶ 20, citing 2 Anderson, *Uniform Commercial Code*, Section 2–204:210, 477 (3d Ed.1997).  With respect to contract formation, the UCC specifies that "[a] contract for sale of goods may be made in any manner sufficient to show agreement * * *."  R.C. 1302.07(A).  R.C. 1302.04, which codifies the statute of frauds with respect to transactions in goods over $500, specifies that a contract is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent * * *."  R.C. 1302.04(A).  "A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing."  *Id.*

{¶ 25} Additionally, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  R.C. 1302.07(C).  "However, in the absence of some basic terms – such as the description and quantity of the goods – a contract may not exist."  *Tubelite* at ¶ 20, citing 1 Hawkland, *Uniform Commercial Code Series*, Section 2–204:3 (2001).  "Quantity is generally the only term that is required for contract formation." *Abraxus Salt*, 2010-Ohio-4138, ¶ 12, citing Official Comment One to R.C. 1302.04 ("The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. * * * Only three definite and invariable requirements as to the memorandum are made by this subsection. * * * [T]hird, it must specify a quantity").

{¶ 26} Citing R.C. 1302.04, the trial court found that the written estimate violated the statute of frauds because no quantity for any of the materials was described in the document. However, despite the blank "Qty" column, the quantity term can be readily discerned because the "Total/Each" and "Total" columns contained identical figures. Therefore, the quantity specified was one each for framing materials, interior and exterior trim, and stairs allowance.

{¶ 27} In its brief, Maple Glen cites *Abraxus Salt* for a case where the court concluded that the lack of a quantity term rendered a price quotation unenforceable as a contract. That case involved a salt purchaser suing a salt distributor after the distributor raised the per-ton price for salt. The purchaser had earlier been provided with a price quotation from the distributor for salt at $38 per ton and had prepaid for salt at that rate, which salt the purchaser received. *Id.* at ¶ 2-3. Later, the distributor switched to a more expensive supplier, and, as a result, informed the purchaser that salt would now cost $110 per ton. *Id.* at ¶ 3. The purchaser sued, claiming that the parties had formed a contract based on the price quotation. *Id.* at ¶ 9. The court rejected this argument, finding that because the parties had not agreed on a quantity of tonnage in the earlier price quotation, the purchaser could not use the quotation to establish an enforceable contract. *Id.* at ¶ 20.

{¶ 28} *Abraxus Salt* is distinguishable as it involved a purchaser of a bulk commodity attempting to use an old price quote, where no quantity had been specified in the quote, to secure a favorable rate for a subsequent purchase of the bulk commodity. Here, however, the estimate presented to Maple Glen was for a one-time purchase of the specific building materials necessary to construct Maple Glen's apartment. Moreover, the quantity term – one – was implicit in the estimate.

{¶ 29} Maple Glen also notes that the trial court found the estimate vague in several respects, including a description of the building materials to be supplied by Premier, the

place of delivery, the time of delivery, and payment. Again, an agreement under the UCC does not necessarily fail because it is indefinite in some respects. R.C. 1302.07(C). To the extent the estimate could be described as vague with respect to the quantity and specification of building materials, R.C. 1302.05(B) permits it to be "explained or supplemented by consistent additional terms". *Metal Seal v. Good Time Outdoors, Inc.*, 11th Dist. Lake No. 2017-L-142, 2018-Ohio-5326, ¶ 46-47. Here, the parties could refer to the blueprints that formed the basis of the estimate to resolve any ambiguity regarding the quantity or specification of the building materials that were the subject of the contract. Time of delivery was not an issue raised by the parties and was separately agreed upon. Place of delivery was also not an issue and Maple Glen's job site was the implicit delivery location. Specific terms of payment were not agreed upon but the statutory presumption if not otherwise agreed is tender of payment upon delivery. R.C. 1302.55(A). Premier's first invoice was consistent with this presumption. This court does not find that the omission of these terms rendered the agreement unenforceable.

{¶ 30} Accordingly, this court concludes that the trial court erred in finding no enforceable contract between Premier and Maple Glen because the written estimate failed to expressly specify a quantity term. This court sustains Premier's first assignment of error and reverses and remands for a determination of whether Maple Glen breached the contract, and if so, whether the evidence introduced at trial established Premier's damages.[3]

{¶ 31} Assignment of Error No. 2:

---

3. Premier raises two additional issues within this assignment of error, arguing that the trial court erred in finding that Maple Glen did not breach its contract with Premier by failing to pay for the delivered materials and that the trial court erred in not awarding damages for the materials unsold by Premier and for the costs of delivering and removing the delivered materials. However, the trial court found no contract between the parties and therefore did not address the issues of breach or damages.

{¶ 32} THE TRIAL COURT ERRED IN RULING THAT PREMIER CONSTRUCTION WAS NOT ENTITLED TO FORECLOSURE OF ITS MECHANIC'S LIEN ON THE REAL PROPERTY OWNED BY MAPLE GLEN APARTMENTS.

{¶ 33} Premier next argues that the trial court erred in dismissing its claim to foreclose a mechanic's lien. Whether Premier demonstrated the validity of its mechanic's lien is a legal issue that this court reviews de novo. *Speelman*, 2018-Ohio-4388, ¶ 18. "Mechanics' lien statutes create rights in derogation of the common law and should therefore be strictly construed as to the question whether a lien attaches, but their procedural and remedial provisions should be liberally construed, after the lien has been created." *Robert V. Clapp Co. v. Fox*, 124 Ohio St. 331 (1931), paragraph one of syllabus, reaffirmed by *Crock Constr. Co. v. Stanley Miller Constr. Co.*, 66 Ohio St.3d 588, 592 (1993).

{¶ 34} The trial court concluded that Premier did not possess a valid mechanic's lien for two reasons. First, the court noted that no valid contract existed between Premier and Maple Glen. However, this court has determined that the trial court erred in finding that the parties had not contracted. Second, the trial court determined that Premier's lien failed to satisfy R.C. 1311.12(A)(1), because the building materials delivered by Premier were not used in the course of improvements at Maple Glen's job site and had instead been retrieved by Premier.

{¶ 35} R.C. 1311.12 provides:

(A) A mechanic's lien for furnishing materials arises under sections 1311.01 to 1311.22 of the Revised Code only if the materials are:

(1) Furnished with the intent, as evidenced by the contract of sale, the delivery order, delivery to the site by the claimant or at the claimant's direction, or by other evidence, that the materials

- 10 -

be used in the course of the improvement with which the lien arises * * *.

{¶ 36} This court does not interpret R.C. 1311.12(A)(1) as requiring proof that the furnished materials were in fact used in the course of the improvement for which the lien arose. By its plain language, the statute provides that a lien arises if the materials are furnished *with the intent* that they be used in the course of the improvement. Thus, it is the intent of the mechanic's lien holder, and not the ultimate use that determines when the lien arises. This reading is bolstered by considering R.C. 1311.12(A)(2), which expressly provides that a lien arises when materials are "[i]ncorporated in the improvement or consumed as normal wastage in the course of the improvement * * *." This provision would be redundant if R.C. 1311.12(A)(1) also required proof that the materials were actually used to improve the real property. Here, the evidence submitted at trial established that Premier furnished the building supplies to Maple Glen by delivering the goods to Maple Glen's real property, and that, through the aforementioned contract and delivery of goods, evidenced its intent that such supplies would be used by Maple Glen in the course of the improvements to the property.

{¶ 37} Consequently, this court finds that the trial court erred in its determination that Premier had not established a valid lien based on the alleged lack of a contract and for a failure to satisfy R.C. 1311.12(A)(1). Whether the mechanic's lien is otherwise valid and enforceable will depend upon the trial court's proceedings on remand. This court sustains Premier's second assignment of error.

{¶ 38} Judgment reversed and the cause remanded for such further proceedings as the trial court may deem necessary to determine whether Maple Glen breached its contract with Premier, and if so, to assess damages due to the breach.

RINGLAND and PIPER, JJ., concur.

- 11 -